IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA

MATTHEW JAMES WILLINGHAM,

    Plaintiff,

v.

CITY OF VALPARAISO, FLORIDA,
a Florida municipal corporation,

    Defendant.

_____/

CASE NO. 3:11cv00542-MCR-CJK
JURY TRIAL DEMANDED

## MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION FOR RECONSIDERATION

An excellent discussion of First Amendment Rights is contained in *Taverns for Tots, Inc. v. the City of Toledo*, 341 F. Supp. 2d 844 (2004). That case discusses First Amendment Rights, first, in terms of freedom of association, including both intimate and expressive association, and then in terms of freedom of speech, which includes the sub-set of expressive conduct as the equivalent of speech. As this Court has pointed out to counsel, freedom of association can be either intimate association, or expressive association.

We accept that the evidence in the present record does not support an intimate association and that there is no evidence in this record of expressive conduct speech. However, the record *does* support the existence of an expressive association. The *Taverns for Tots* Court says at page 851:

> "In recognizing an individual's right to associate to engage in activities protected by the First Amendment, the Supreme Court has reasoned: 'An individual's freedom to speak, to worship, and to petition the government for the redress of grievances could not be vigorously protected from interference by the State unless a correlative freedom to engage in group effort toward those ends were not also guaranteed.'" *Roberts,* 468 U.S. at 622, 104 S.Ct. 3244 (citing *Citizens Against Rent Control/Coalition for Fair Housing v. Berkeley,* 454 U.S. 290, 294, 102 S.Ct. 434, 70 L.Ed.2d 492 (1981)). 'To be entitled to First Amendment protection, expressive association by a group must involve some form of

1

public or private expression. *Boyscouts of America v. Dale 530'*"

In Taverns for Tots, the Court found there to be no expressive association and therefore no entitlement to First Amendment protection. That "association" was a group of Tavern owners whom the Court decided had come together for the sham purpose of contesting an anti-smoking ordinance.

A seminal case discussing the rights of expressive association is *Boyscouts of America v. Dale 530 U.S. 640 (2000)*. The Boyscouts in that case were a formal organization. The Court expressly found that it did not matter that not everyone shared the same purpose. Willingham's research has shown no case law requirement that an association be formally organized, chartered, or otherwise more formally recognized than that it actually exists. In that regard, this record contains the testimony of City Attorney Douglas Wyckoff, (Doc # 54-5_Exhibit 22) who said in his deposition at page 18 - line 14 through page 21- line 9, the following:

```
14      Q     Would it be fair to say that you visited
15   Willingham Seafood and Matt Willingham's home many times
16   over a course of years beginning in 2006?
17           MR. BOWMAN:  Objection, leading.
18           THE WITNESS:  No, the way you have phrased the
19      question.
20   BY MR. CHESSER:
21      Q     All right.  Tell me why not.
22      A     Well, the property had -- there was some
23   distance between the residence and the business
24   structure.  I would not say I visited his house many
25   times.  I visited his house a few times.  I visited his
```

```
 1  business many times.
 2      Q    When you visited his business, was it to
 3  purchase shrimp?
 4      A    Sometimes, but usually just a social.  It was
 5  a daily -- I think my perception and understanding from
 6  Brent Smith, particularly, that it was a daily kind of
 7  gathering spot for that clique.
 8      Q    They were guys who enjoyed each other and
 9  enjoyed being together?
10           MR. BOWMAN:  Object to the form.
11           THE WITNESS:  Well, I don't know what was
12       going on in their heads, but they all would appear
13       there and seemed to be enjoying themselves.
14  BY MR. CHESSER:
15      Q    Nobody seemed to be on the clock while they
16  were there?
17           MR. BOWMAN:  Object to the form.
18           THE WITNESS:  I don't really know what you
19       mean by "on the clock."
20  BY MR. CHESSER:
21      Q    Well, I mean, that was a place where they and
22  you would meet, not doing business, but doing social
23  things?
24      A    I think there was -- some of the business -- I
25  think there was a business discussion a lot of times.
```

```
 1      Q    By "business discussion," you mean the shrimp
 2  business or some other business?
 3      A    I think that if you consider politics a
 4  business -- I don't think many people would say it's
 5  not -- there was a lot of discussion -- depending on
 6  what time of the year and what year it was -- on how
 7  Brent Smith could get the Mayor unelected.
 8           There was a lot of discussion about how James
 9  Campbell could get elected and re-elected.  There was a
10  lot of talk about that.  There was discussion, I'm sure,
11  of the seafood business.
12      Q    A lot of politics and the politics basically
13  local, meaning Valparaiso, and with James Campbell, at
14  least, county business?
15      A    That's my impression, yes.
16      Q    Okay.  And when you all met there, did you eat
17  there normally or did they just have a beer and go home?
18      A    It was, to my recollection, not normal or
19  certainly not a daily food experience.
20      Q    Okay.  About what time would they meet?
21      A    Five-thirty, six.
22      Q    And they would meet for an hour or so?
23      A    Well, there were many times that I left and
24  everyone else was still there, so I obviously can't
25  speak to how long they stayed there.
```

```
1    Q    And I assume the opposite also happened, times
2    when various others would wander away and you were still
3    there?
4    A    Yes.
5    Q    Did customers come up while you were there?
6    A    Sometimes.
7    Q    And if they came up, did Matt or someone there
8    deal with those customers and sell them seafood?
9    A    I think so.
```

On page 32 at line 13 of Mr. Wyckoff's Deposition (Doc # 54-5_Exhibit 22), Mr. Wyckoff acknowledged that the F-35 lawsuit was the subject of his conversation with Matt Willingham, and that he was aware Matt was against the lawsuit.

The relationship between Wyckoff, Mayor Arnold, and three members of the City Counsel is documented in the Final Order signed by Judge Tom Remington on July 26, 2012, attached to Matt Willingham's Affidavit in Response to Motion for Summary Judgment and Statement of Undisputed Facts (Doc # 67_Page 8). The Court's Order finds as a matter of fact that the F-35 lawsuit was a defining issue in the City of Valparaiso and that the Mayor and two other Commissioners, together with Mr. Wyckoff, were on one side of that issue. Mr. Wyckoff's deposition (Doc # 54-5_Exhibit 22), as supported by that of Matt Willingham quoted below, establishes that the "association" which Wyckoff characterized as the business of politics at Willingham Seafood, was the other side of that political issue. His word for the association that met, apparently daily, was "clique".

There can be no stronger interference with the right of expressive association than to fire a city employee who participates in the association.

The following testimony was offered by Matt Willingham in his March 16, 2012 deposition at page 187 (Doc #54-1_Exhibit 2). It is repeated here not for Willingham's relationship with Doug Wyckoff, or for Wyckoff's motive, which this Court has found not to be actionable, but because of Willingham's description of the political discussion that was going on in the expressive association that existed at Willingham Seafood.

```
10      Q    When did your relationship with Doug Wyckoff
11   change?
12      A    It was during the time that the city had filed
13   suit against the Air Force regarding the F-35.
14      Q    Why did your relationship with Doug -- Mr. Wyckoff
15   change, to your knowledge, at least from your perspective?
16      A    My perspective was that he didn't -- I believe
17   Commissioner Smith felt that the city was moving too fast in
18   a lawsuit and not negotiating with the Air Force.  And he
19   didn't like Brent's take on the lawsuit.  And there was just
20   different things Doug was doing that didn't appear to be --
21   you know, he was calling commissioners at different times,
22   you know, on the issues and it just -- relationship grew
23   apart.  The F-35 lawsuit issue drawed (sic) the line in the
24   sand with a lot of citizens and friends in our community.
25      Q    So it's your testimony that your relationship with
                    Nina E. Trawick, RPR, FPR
```

```
                                                    188
1   Doug Wyckoff slowly drifted apart over a period of time?
2      A    Well, it started with the F-35, but where it ended
3   is, Doug had a -- in my opinion, had a drinking problem.  He
4   couldn't have one or two drinks.  He would drink till he
5   couldn't walk.  He lived in DeFuniak.  He would have to
6   either stay at my house or stay at Brent's.  This got to be
7   repeated.
```

Again, Matt Willingham's relationship with Wyckoff is not actionable. However, it does show the political content and purpose of the association that was going on at Willingham Seafood. In his deposition of May 18, 2012   (Doc # 54-2_Exhibit 3), on page 13:

```
 6    Q    Why you believe that Mr. Wyckoff was acting out of
 7  malice towards you in his involvement in your termination.
 8    A    Well, there were several things.  Getting back
 9  to -- we used to all go to lunch together.  Then after he
10  filed the F-35 lawsuit, he and Commissioner Smith did not
11  get along anymore, and he knew that me and Commissioner
12  Smith were friends.  So I think it was several things that
13  he just didn't care what happened.
14    Q    You understand I'm not asking you why Mr. Wyckoff
15  stopped liking you, for lack of a better term.  I'm asking
16  you why you believe that Mr. Wyckoff was acting out of
17  malice toward you.
18    A    And I just told you.
19    Q    Okay.  The first thing you said was the dock
20  incident.  The second thing was the F-35 issue.  Is there
21  anything else?
22    A    The mayor's race.
```

Again, it is clear in the Willingham deposition of May 18, 2012 (Doc #54-2_Exhibit 3) that he was a friend of Brent Smith, not a friend of Doug Wyckoff. We do not re-argue the Court's conclusion here that neither Willingham's intimate association with Smith, nor the animus of Wyckoff, are the basis for Willingham's First Amendment rights. However, the testimony *does* show a continuous political conversation going on at Willingham Seafood,

7

among numerous people, which this Court has every reason to categorize as an "expressive association". There is ample evidence in this record from which a jury could conclude that the Willingham Seafood association contributed to the termination of Matthew Willingham as a Valparaiso police office. For a City employee to be disciplined or fired because of his association as described in this testimony is no different from being fired because of membership in the Democratic or Republican party, where the job is absolutely non-political. The political result of the City's heavy-handed treatment of Willingham is even more evident by Mayor Arnold's public "finding of fact" that Willingham was a thief for stealing City water. (Particularly when he knew the finding was contradicted and probably not true.) If the clique had any credibility before, it certainly had less after the City, through its Mayor, got through with Willingham.

Matt Willingham's meetings with others, even if private, were indisputably political expression, and that "clique" constituted an expressive association that is entitled to First Amendment protection.

As argued before, we believe the burden has shifted to the City to show some legitimate reason for its termination of Matt Willingham.

Respectfully submitted:

s/ D. Michael Chesser
D. MICHAEL CHESSER
Florida Bar Number 144850
NICKOLAS PETERSEN
Florida Bar Number: 243434
CHARLES J. COMELLA
Florida Bar Number: 71645
CHESSER & BARR, P.A.
1201 Eglin Parkway
Shalimar, Florida 32579
*mike@chesserbarr.com*
*petersen@chesserbarr.com*
*comella@chesserbarr.com*
Attorneys for Plaintiff

8

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a copy of the foregoing has been furnished by electronic notice through the CM/ECF system to J. BRUCE BOWMAN, CONERLY, BOWMAN & DYKES, P.O. Box 6944, Destin, FL 32550, bbowman@emeraldcoastlawyers.com, on this 26th day of February, 2014.

Respectfully submitted:
s/ D. Michael Chesser
D. MICHAEL CHESSER
Florida Bar Number 144850
NICKOLAS PETERSEN
Florida Bar Number: 243434
CHARLES J. COMELLA
Florida Bar Number: 71645
CHESSER & BARR, P.A.
1201 Eglin Parkway
Shalimar, Florida 32579
Phone: (850) 651-9944
Fax:    (850) 651-6084
*mike@chesserbarr.com*
*petersen@chesserbarr.com*
*comella@chesserbarr.com*
Attorneys for Plaintiff
