IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION


MATTHEW JAMES WILLINGHAM,

        Plaintiff,

v.                           Case No. 3:11cv542-MW/CJK

CITY OF VALPARAISO,
FLORIDA,

        Defendant.

_____/

## ORDER GRANTING IN PART AND DENYING IN PART
## JUDGMENT AS A MATTER OF LAW

This is a civil rights case.  Plaintiff Matthew Willingham sued the City of

Valparaiso for discharging him in retaliation for exercising his First Amendment

rights.  Mr. Willingham specifically alleges that City Mayor John Arnold fired him

because he expressed constitutionally protected speech and for his political

associations.

After Mr. Willingham was fully heard at trial and before the case was

submitted to the jury, the City moved for judgment as a matter of law on various

issues.  ECF No. 289 at 145.[1]  The motion was denied and the jury returned both counts in Mr. Willingham's favor.

The City now renews its motion for judgment as a matter of law or, in the alternative, motion for a new trial.  ECF Nos. 303-305.  After considering the parties' arguments, the motion is granted in part and denied in part.

## FACTS[2]

In May 2006, Mr. Willingham was hired as Police Captain by the City's police department.  *See* ECF No. 291 at 76; ECF No. 290 at 236.  His job responsibilities included enforcing certain City codes.  ECF No. 291 at 83-84.  No one, not even Mayor Arnold, has ever disputed that Mr. Willingham overall was a good cop.

Mr. Willingham concurrently owned and operated a personal seafood business, "Willingham Seafood."  The shop was a local watering hole where townsfolk, including various City employees and officials, would purchase food and often discuss City politics.  *See, e.g.*, ECF No. 290 at 297.

Among them was Douglas Wyckoff, the City Attorney.  He and Mr. Willingham were friends until they had a falling out when Mr. Willingham

---

[1] The City technically moved for a "directed verdict."  ECF No. 289 at 145.  This constitutes a motion for judgment as a matter of law.  *See* Fed. R. Civ. P. 50 advisory committee's note to 1991 amendment.

[2] This is a summary of the pertinent facts in the light most favorable to Mr. Willingham, the nonmoving party.

informed him that he was no longer welcome at Willingham Seafood.  Mr. Willingham accused him of having a drinking problem.  The City Attorney would later become Mr. Willingham's enemy.

Commissioner Brent Smith was another regular at Willingham Seafood.  *Id.* He and Mr. Willingham were close friends.  This was well known.  Commissioner Smith disagreed with the Mayor on various issues.  Constantly challenging Mayor Arnold produced what Commissioner Smith described as a "strained" relationship. *Id.* at 291.

Commissioner Smith intended to dethrone Mayor Arnold.  After an unsuccessful bid for mayor in 2006, he ran again in March 2010.  *Id.* at 290. Commissioner Smith announced his candidacy sometime in the fall of 2009.  Mr. Willingham failed to show that this announcement occurred before he was terminated.  Mayor Arnold, for his part, acknowledged that he assumed that Commissioner Smith would likely run against him and that Mr. Willingham supported him.  *See* ECF No. 289 at 130-31.  There is no evidence, however, that Mayor Arnold was aware that Commissioner Smith officially announced sometime in fall 2009.  *See* ECF No. 290 at 316-17.

There also is no evidence that prior to his termination, Mr. Willingham actively campaigned and supported Commissioner Smith in the 2010 mayoral race. Commissioner Smith, for example, testified that in spring 2008 he hosted a

political rally for which he used Willingham Seafood's catering services.  *Id.* at 339-341.  This rally took place more than a year and a half before Mr. Willingham was disciplined and was completely unrelated to the mayoral race.  *See id.* at 343-44.  At the time of his termination, Mr. Willingham's "participation" in Commissioner Smith's campaign was limited to discussing political issues at Willingham Seafood.  Additionally, there is no evidence that Mayor Arnold was aware of any active participation by Mr. Willingham in Commissioner Smith's campaign.

The City hired Carl Scott as City Administrator in 2009.  ECF No. 288 at 25-26.  He revamped code enforcement in the City, setting out to bring the City into compliance with state regulations.  His task included assessing the proper zoning of properties in the City and filing a report.

City Administrator Scott also sought to enforce certain previously unenforced City codes.  *Id.* at 27-31.  At the time, the City's police was partially responsible for code enforcement.[3]  ECF No. 291 at 83.  On October 4, 2009, Mr. Willingham, as Captain, met with Chief of Police Joe Hart and City Administrator Scott to discuss a list of pending building code violations.  City Administrator Scott wanted Mr. Willingham to enforce certain codes.  ECF No. 288 at 32.  Mr.

---

[3] The police generally did not inspect buildings.  Instead, they responded to complaints about ordinance violations.  Violations of some codes, such as those related to electrical systems, were outside their purview.  When citizens lodged complaints concerning those codes, the City would outsource its response.

4

Willingham expressed reservations about both the use of police to inspect property for building code violations and the sudden enforcement of previously unenforced code provisions against existing businesses.  The three agreed to take the issue to the City Commission at its upcoming meeting.  ECF No. 291 at 124.

The next day, October 5, 2009, City Administrator Scott gave Mr. Willingham a letter citing his seafood business for multiple code violations.  *See id.* at 95-96; ECF No. 288 at 39-45 (describing the alleged violations).  This added a dimension to Mr. Willingham's perception of the code enforcement strategy proposed by City Administrator Scott.  Following the citation, Mr. Willingham counted himself among the businesses he felt were subject to the sudden and unfair application of previously unenforced code provisions.

Mr. Willingham attended a City Commission meeting on October 12, 2009.  *See* Mr. Willingham's Trial Ex. 46.  During the Commission's discussion of a pending resolution to designate Carl Scott as a "code enforcement officer," Mr. Willingham asked for an opportunity to address the Commission.  Mr. Willingham, who went in plain clothes, identified himself as a business owner and provided the address of Willingham Seafood.  He did not attend as "Captain Willingham," nor did he speak on behalf of the police department.  *See id.*

Mr. Willingham started out by explaining that he did not think the City Administrator should be given enforcement responsibility.  He then discussed his

own negative experiences with the City Administrator acting as code enforcer.  He concluded by offering his general concerns with empowering the City Administrator with code enforcement authority.  *See id.*

Mr. Willingham testified that he addressed the Commission because he was "concerned about the aggressive approach that [City Administrator Scott] was about to take on a bunch of businesses in [the City]."  ECF No. 291 at 97.  He believed that widespread citations like the one against Willingham Seafood would "have a major financial impact in [the] community."  *Id.*  Although Mr. Willingham referenced his own citation as an example in his message to the Commission, his overarching objection was to enforcement actions against businesses within the City.

In a letter dated October 14, 2009, Mayor Arnold informed Mr. Willingham that he was "considering" his termination.  Then, by letter dated October 28, 2009, Mayor Arnold terminated Mr. Willingham, stating that Mr. Willingham's code violations constituted "illegal conduct" and that his conduct was "even more shocking and abhorrent given [his] employment as a Captain in the Valparaiso Police Department in charge of Code Enforcement."  Mr. Willingham's Trial Ex.

39, at 2.  Mayor Arnold concluded by telling Mr. Willingham that he had the right to appeal the termination, which he did.[4]  *Id.* at 3.

Mr. Willingham attempted to have his termination reviewed by the City Commission on November 9, 2009.  *See* Mr. Willingham's Trial Ex. 48.  On the day's agenda was a resolution to reinstate Mr. Willingham.  Commissioner Brent Smith, who had placed the item on the agenda, introduced the issue and confronted Mayor Arnold about the termination.  Commissioner Smith specifically asked the Mayor why he unilaterally discharged Mr. Willingham, as opposed to letting Chief Hart handle the issue.  *See id.*

The Mayor explained that the City Charter gave him authority over police department personnel problems and that he had "discharged" that duty.  Mayor Arnold also stated that it was improper to discuss the merits of the termination because Mr. Willingham had appealed the matter internally.  City Attorney Wyckoff reinforced the Mayor's position and advised the Commission that because Mr. Willingham "opted" to pursue an appeal through the internal grievance process, it would be "inappropriate" to discuss the termination.  Both the Mayor and the City Attorney thus took the position that appealing through the

---

[4] Mr. Willingham initially appealed Mayor Arnold's decision through the police department's internal grievance process.  As this Court repeatedly noted on the record, it is unclear whether the internal grievance process applies to decisions made by the Mayor pursuant to his authority under the City Charter.

internal grievance process and directly to the Commission were mutually exclusive options.

Mr. Willingham, from the gallery, exclaimed that he *had* attempted to appeal the termination directly to the Commission. The Mayor responded that Mr. Willingham's appeal to the Commission was "denied" because he was responsible for "personnel" actions. The Mayor, in other words, had also previously taken the position—which he maintained at the meeting—that a direct appeal to the Commission was unavailable to Mr. Willingham.[5]

Mr. Willingham's attorney, in attempt to resolve the mutual exclusivity problem, stood up and withdrew the appeal. In what amounts to nothing more than a bait-and-switch, City Attorney Wyckoff then interjected and explained that since the internal appeal had been withdrawn, there was nothing for the Commission to review.[6] Ignoring this comment, Commissioner Smith seized the opportunity and moved, pursuant to the City Charter, to override the Mayor's decision and reinstate Mr. Willingham as Police Captain. Another commissioner seconded the motion.

---

[5] As this exchange reveals, Mr. Willingham had previously invoked his right to appeal his decision directly to the Commission with the Mayor. The Mayor, however, denied the direct appeal on the basis that such appeal was unavailable. Mr. Willingham did not accept the Mayor's decision. He persisted in his assertion and went directly to the Commission.

[6] To the extent there were allegations that the jury found in Mr. Willingham's favor solely because of City Attorney Wyckoff's conduct, this Court notes that it gave the jury specific instructions that the City could not be held liable for the actions of the City Attorney.

At this point, Mayor Arnold stated that the motion was not in order because the City Charter did not apply to his decisions.  Seeking clarification, Commissioner Smith asked if Mayor Arnold was refusing to call his motion to question.  Mayor Arnold indeed was refusing.  Then, using his power as chairman, the Mayor began to move on to the next item.

At that moment, Mr. Willingham's attorney interrupted and asked to be recognized.  The attorney, relying on the plain meaning of Article IV of the City Charter, argued that Mr. Willingham was entitled to review by the Commission.  In response, City Attorney Wyckoff reiterated his position that Article IV of the City Charter did not provide Mr. Willingham direct review of his termination with the Commission.  Mayor Arnold agreed and moved to the next item.

## STANDARD

Under Federal Rule of Civil Procedure 50, judgment as a matter of law is proper when "a reasonable jury would not have a legally sufficient evidentiary basis to find for [a] party on [an] issue."  Although the evidence is viewed in the light most favorable to the nonmoving party, that party must "put forth more than a mere scintilla of evidence suggesting that reasonable minds could reach differing verdicts."  *Abel v. Dubberly*, 210 F.3d 1334, 1337 (11th Cir. 2000).

**DISCUSSION**

Mr. Willingham seeks to hold the City liable for Mayor Arnold's actions. The City first retorts that it cannot, as a matter of law, be held liable for the actions of Mayor Arnold. Second, the City contends that Mr. Willingham did not exercise constitutionally protected speech. If Mr. Willingham's speech is not protected, the City reasons, firing him for it is not actionable under section 1983.

Finally, the City attacks the evidentiary basis for the verdict, maintaining that Mr. Willingham failed to present sufficient evidence from which a reasonable juror could conclude that Mayor Arnold terminated Mr. Willingham because he exercised constitutionally protected speech and because of his political association with Commissioner Brent Smith.[7]

**I**

The threshold issue is whether the City can be held liable for Mayor Arnold's termination of Mr. Willingham. Under section 1983, municipalities "may be held liable only for the execution of a governmental policy or custom," *Kamensky v. Dean*, 148 F. App'x 878, 880 (11th Cir. 2005), and not simply

---

[7] Notably, although the City did argue at the close of Mr. Willingham's case-in-chief that he failed to prove "each and every element of [his] cause of action," ECF No. 289 at 145, the City has not renewed a "sufficiency of the evidence" argument as to Mr. Willingham's free speech claim, *compare* ECF No. 304 (attacking only whether Mr. Willingham's speech at the October 12, 2009, City Commission meeting concerns a "matter of public concern"), *with* ECF No. 305 (assailing the sufficiency of the evidence supporting each element of Mr. Willingham's freedom of association claim). This Court, out of an abundance of caution, nevertheless addresses whether there was a legally sufficient evidentiary basis to find for Mr. Willingham on his free speech claim.

because they employ a tortfeasor, *see Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 691 (1978).

"Municipal liability . . . may be premised upon a single illegal act by a municipal officer only when the challenged act may fairly be said to represent official policy . . . ." *Morro v. City of Birmingham*, 117 F.3d 508, 510 (11th Cir. 1997). Thus, "liability may arise with regards to an employment decision, such as a termination, provided that the decisionmaker possesses *final authority* to establish . . . *policy* with respect to the action ordered." *Quinn v. Monroe Cnty.*, 330 F.3d 1320, 1325 (11th Cir. 2003) (internal quotation marks omitted); *see also Gattis v. Brice*, 136 F.3d 724, 725 n.2 (11th Cir. 1998) ("If a county official holds final policymaking authority for the county in the subject area of the alleged constitutional violation, that official's decisions may constitute county policy.").

A municipal employee generally is "considered a 'final policymaker' for governmental liability purposes 'only if his decisions have legal effect without further action by the governing body, and if the governing body lacks the power to reverse the . . . employee's decision.' " *Kamensky*, 148 F. App'x at 880 (alteration in original) (quoting *Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1292 (11th Cir. 2004)). "A municipal official is not a final policymaker," however, "when his or her decisions are subject to meaningful administrative review." *Maschmeier v. Scott*, 269 F. App'x 941, 943 (11th Cir. 2008).

Accordingly, the inquiry focuses on whether there was "an actual 'opportunity' for 'meaningful' review." *Holloman*, 370 F.3d at 1292; *see also Oladeinde v. City of Birmingham*, 230 F.3d 1275, 1295 (11th Cir. 2000) (emphasizing that there must be an actual "opportunity" for "meaningful administrative review").  To make this determination, courts "look not only to 'state and local positive law,' but also 'custom and usage having the force of law.' " *Holloman*, 370 F.3d at 1292.

In this case, Mr. Willingham attempts to hold the City liable for Mayor Arnold's decision to terminate him.  The City, in response, claims that Mr. Willingham failed to allege in his amended complaint that Mayor Arnold had been delegated final policymaking authority.  *See* ECF No. 303 at 14.  The City also contends that Mayor Arnold is not the final policymaker because his employment decisions were subject to review by the City Commission.  *Id.* at 12.

As a preliminary matter, the argument concerning Mr. Willingham's purported failure to allege delegation is a nonstarter.  The City essentially claims that a failure to allege the *specific* theory of municipal liability—here, delegation to a final policymaker—fails the Federal Rules of Civil Procedure's pleading standards.[8]

---

[8] As this Court will explain, this argument is meritless.  This superfluous argument is representative of both parties' litigation strategy.  This entire case is marred with redundant, unnecessary filings that fail to advance the central issues.

The law does not support such a heightened pleading standard.  A plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  In the municipal liability context, facts tailored to the specific theory of liability are unnecessary so long as a reasonable inference can be drawn from the allegations that "municipal policy or custom directly caused the complained-of constitutional injury." *Edwards v. City of Kingston*, No. 1:08-CV-803 LEKRFT, 2010 WL 3761892, at *7 (N.D.N.Y. Sept. 20, 2010); *see also Barnhart v. Town of Parma*, 252 F.R.D. 156, 162-63 (W.D.N.Y. 2008) (holding that the plaintiffs' complaint sufficed "[a]lthough [the] factual allegations . . . [did] not readily reveal [the] theory for imposing municipal liability against the [defendant]").

The amended complaint contains sufficient facts from which the reasonable inference can be drawn that the City's policy or custom caused the alleged violation.  *See* ECF No. 77.  Indeed, contrary to the City's assertion, Mr. Willingham's factual allegations reveal a final policymaker theory of liability.  For instance, the amended complaint reads:

> [T]he City Commission followed a practice of allowing its City attorney to guide the Mayor in taking actions such that together they set City policy in the [employment context].  The City Commission often tacitly ratified or by inaction *allowed City policy to be set by the Mayor* . . . .

13

*Id.* at 2 (emphasis added).  From these facts, the City was on notice that Mr. Willingham believed it liable for the actions of the Mayor, whom the City allowed to set municipal policy.  Mr. Willingham therefore sufficiently pled that Mayor Arnold was the final policymaker for the City.  In any event, the City tried the issue by consent by filing several motions attacking municipal liability on the merits.  *See, e.g.*, ECF No. 80.

This Court now turns to the substance of the dispute.  The City can be held liable if Mayor Arnold is a final policymaker in the employee-discipline context. "State and local positive law," as well as "custom and usage having the force of law," are dispositive of whether Mayor Arnold is a final policymaker.  *Holloman*, 370 F.3d at 1292 (internal quotation marks omitted).

The City Charter is the starting point.   It grants the Mayor general supervisory powers over the City's police department.  Valparaiso, Fla., City Charter art. VI, § 1, ECF No. 80-5 at 53.  Such powers are subject to the City Commission, which "at all times" has the "power to overrule any act of a commissioner in carrying on his department" by a majority vote.  Valparaiso, Fla., City Charter art. VI, § 1, ECF No. 80-5 at 44.  Thus, the City Charter on its face vests final power over employment decisions with the City Commission.

This codified authority is not in dispute.  Mr. Willingham, for example, concedes that Mayor Arnold's employment decision "was theoretically subject to

review by the City Commission." ECF No. 311 at 4. The parties instead disagree on the effect of such authority.

The City would have this Court rest its decision solely on the Charter's allocation of power. It contends that because the City Charter authorizes the Commission to overturn the Mayor's employment decisions, the Commission, and not the Mayor, is the final policymaker. ECF No. 303 at 12-14. Mr. Willingham, in response, cites a line of Eleventh Circuit cases for the proposition that "the existence, on paper, of a review mechanism does not prevent a municipal decision-maker . . . from being deemed the final policymaker, with respect to a particular decision." ECF No. 311 at 3.

In *Holloman*, a high school principal summoned a student, Michael Holloman, to his office for refusing to recite the Pledge of Allegiance. 370 F.3d at 1261. The principal decided to punish Holloman by requiring that he serve three days' detention before receiving his high school diploma. *Id*. "Since graduation was [in less than three days], there was not enough time left in the school year for Holloman to serve his detentions while still being able to receive his diploma on graduation day." *Id.* Rather than not receive his diploma, Holloman agreed to be paddled as substitute punishment. *Id.*

On appeal, the Eleventh Circuit determined that the school board could be held liable because the principal acted as a final policymaker in the discipline

context despite the existence of a "formal multi-step appellate process that was theoretically available on paper." *Id.* at 1293. The court notably reached its conclusion by considering how the circumstances surrounding the principal's actions deprived Holloman of the opportunity for meaningful review.

Imposing a three-day detention, by itself, did not convert the principal into a final policymaker. Had graduation not been looming, Holloman could have employed the review process before serving his detention. This presumably would have stripped the principal of final policymaking authority. However, the time it would take to serve the detentions, coupled with the principal's refusal to stay them until after graduation, meant that Holloman could not, "as a practical matter, take advantage" of the review process without some aspect of the punishment— missing graduation—becoming irreversible. *Id.* Similarly, the alternative, paddling, could not be undone with an *ex post* review by the school board. *Id.*

The codified review process in *Holloman* did not foreclose a finding that Holloman lacked the opportunity for meaningful review. Here too, the City Charter's review mechanism is not dispositive. Rather, as *Holloman* teaches, circumstances can convert an otherwise functional review process into one which fails to provide an opportunity for meaningful review. *See Maschmeier*, 269 F. App'x at 944 (explaining that to establish that a reviewing entity's review is not meaningful, the plaintiff "would need to show that the [entity] has defective

16

procedures, merely 'rubber stamps' the official's decisions, or ratified the official's decision and improper motive").

As a prefatory point, it is important to understand that Mr. Willingham's sole avenue for review was a direct appeal to the City Commission.  In its motion for judgment as a matter of law, the City does not argue that Mayor Arnold's decision was subject to review through the internal grievance process.  *See* ECF No. 303 at 16-17.  This likewise was not the City's position at trial.  In fact, as this Court previously explained on the record, Mr. Willingham arguably had no right to appeal via the grievance process but was limited to seeking review by the City Commission because Mayor Arnold terminated Mr. Willingham pursuant to his powers under the City Charter.  *See* ECF No. 149 at 4 n.3.

The proper analysis, therefore, is whether Mr. Willingham was deprived of the opportunity for meaningful review set forth by the City Charter.  The evidence demonstrates that a defective execution of the City Charter's procedures deprived Mr. Willingham of the opportunity for meaningful review of his termination.

The Mayor first attempted to thwart review by instructing the Commission that discussing Mr. Willingham's termination would be improper in light of the pending internal appeal.  There is no question that Article IV of the City Charter authorizes the Commission to review the Mayor's personnel actions at any time.  Nowhere does that provision condition the Commission's authority on there not

being a pending internal appeal.  Nevertheless, Mr. Willingham acquiesced and withdrew his internal appeal.[9]

This proved fruitless.  Even after two commissioners moved to reinstate Mr. Willingham and after Mr. Willingham's attorney explained to the commissioners why the plain reading of Article IV authorized review, the Mayor, undeterred, refused to call a vote, closed discussion and moved to the next agenda item.

This is not a case where the Commission summarily rejected Mr. Willingham's appeal.  Likewise, the commissioners did not willingly refrain from voting.  The commissioners instead either did not understand that they had the power to review the Mayor's decision—as they had been told by their attorney—or, after the Mayor ignored the motion by some commissioners to reinstate Mr. Willingham, felt powerless to force a vote.  There is no way that Mr. Willingham could have, "as a practical matter, take[n] advantage" of the review mechanism set by the City Charter when both the Mayor, as chairman, and the City Attorney,[10] through his legal advice, sabotaged the entire process.  *Holloman*, 370 F.3d at 1293

Additionally, and viewed from a different angle, the review mechanism itself is internally unworkable, at least as applied to actions by the Mayor.  In situations where the Commission is tasked with reviewing the Mayor's decisions,

---

[9] This should have resolved the purported obstacle to review erroneously conjured by the Mayor and the City Attorney.

[10] *See generally* Mr. Willingham's Trial Ex. 48 *passim*.

the Charter positions the perpetrator as chairman of the reviewing entity and allows

him to avoid review by directing the Commission's procedures.[11]  *See* Valparaiso,

Fla., City Charter art. IV, § 8, ECF No. 80-5 at 45 (providing that a chairman pro

tem acts in the Mayor's absence).  Consequently, under either viewpoint, the

Mayor is insulated from review and Mr. Willingham is deprived of the opportunity

for meaningful review.  This transforms Mayor Arnold into the City's final

policymaker.

This conclusion is not at odds with the precedent cited by the City.  The

Eleventh Circuit in *Quinn* held that a city official was not a final policymaker

because the official's decision to terminate the plaintiff was "subject to meaningful

administrative review by the [reviewing entity]."  330 F.3d at 1326.  Crucial to the

court's holding, however, was that the plaintiff could "point to no *cognizable*

*defect* in the [review] proceedings" undertaken by the reviewing entity.  *Id.*

(emphasis added).

In that case, the reviewing entity conducted a "full adversarial and

evidentiary hearing, which lasted three days and during which the parties were

each represented by counsel and had the opportunity to present and cross-examine

---

[11] James Madison's famous exhortation comes to mind: "[n]o man is allowed to be a judge in his own cause, because his interest would certainly bias his judgment, and, not improbably, corrupt his integrity."  *The Federalist* No. 10. (James Madison); *see also The Federalist* No. 80 (Alexander Hamilton) ("No man ought certainly to be a judge in his own cause, or in any cause in respect to which he has the least interest or bias."); *cf. Swann v. Charlotte-Mecklenburg Bd. of Ed.*, 431 F.2d 135, 137 (4th Cir. 1970) (explaining that a federal district judge may not sit on an appellate panel reviewing his own decision).

witnesses." *Id.*  Here, the proceedings before the City Commission are a far cry from those in *Quinn*.  From the moment the agenda item to reinstate Mr. Willingham came up, Mayor Arnold denounced any attempt to review his decision and quelled all discussion on the matter.  As the chairman, he was in a unique position to do so.  Furthermore, given the City Attorney's advice, the remaining commissioners reasonably believed that they lacked the authority to review the termination.  Therefore, unlike in *Quinn*, Mr. Willingham has pointed to a cognizable defect in the review proceedings.

Similarly, in *Scala v. City of Winter Park*, the Eleventh Circuit found that two officials were not final policymakers because the city's "governing documents provide employees with an opportunity for meaningful administrative review of termination decisions . . . *and* [because] there is *no evidence* that the [reviewing entity] *merely rubber-stamps the decisions* of the appointing authorities."  116 F.3d 1396, 1402 (11th Cir. 1997) (emphasis added).  Because "rubber-stamping" is a variety of procedural defect, *Scala* effectively also directs courts to examine the execution of a codified review process.

When an entity "rubber-stamps" a decision, at the very least it masquerades as a legitimate review.  In the instant case, with the exception of the Mayor, who put on his chairman mask, the Commission was not even able to put on a show.  The Mayor bluntly denied Mr. Willingham review and pronounced that Article IV

of the Charter—which the City now contends immunizes it from liability—did not apply to his personnel decisions.

The City further claims that these purported deficiencies do not justify liability because Mr. Willingham "could have invoked the equitable jurisdiction of a State court to compel Mayor Arnold to call the motion for vote."  ECF No. 303 at 18.  Stated differently, since the judiciary could have compelled review, Mr. Willingham allegedly never lost the opportunity for meaningful review by the Commission.

This argument is unavailing for several reasons.  First and foremost, the Eleventh Circuit has explicitly stated that to divest a municipal official of final policymaking authority, her decisions must be subject to meaningful "administrative" review.  *See, e.g.*, *Scala*, 116 F.3d at 1401 ("[Eleventh Circuit] . . . decisions have consistently recognized . . . that a municipal official does not have final policymaking authority over a particular subject matter when that official's decisions are subject to meaningful administrative review.").  Judicial review simply does not constitute administrative review.  Had the Eleventh Circuit intended judicial review to suffice, it would have said so.

It also makes no sense to insulate municipalities from liability because the judiciary possesses the power to compel review.  Under the delegation theory of liability, the question is whether the municipality has delegated authority such that

an employee's actions can be fairly said to represent official policy.  A court order compelling review of an action taken pursuant to delegated authority does not undo the delegation *at the time of the deprivation*.

Moreover, because the judiciary exists independently from municipal entities, a court order is not a municipality's own "review" of the authority it has delegated.  Were that the case, courts could serve as the backstop to all delegation of authority.  That would invariably insulate municipalities from liability for the actions of its final policymakers.

To conclude, the City of Valparaiso endeavors to insulate itself from liability for the constitutional deprivations caused by Mayor Arnold.  The City claims that it is not liable for the Mayor's unlawful termination of Mr. Willingham because the City Charter vests final policymaking authority in the City Commission.  On paper, this is true.  Here, however, the Charter's process broke down and Mr. Willingham was deprived of the opportunity for meaningful review by the Commission.

This breakdown occurred in several ways.  First, despite their current position, the City Attorney and the Mayor told members of the Commission that they lacked the authority to review the termination.  The evidence indicates that some commissioners reasonably relied on their attorney's advice and did not understand that they in fact had the power to review the termination.

Second, the Mayor, in response to two commissioners that disregarded the City Attorney's advice, refused to call a vote on a motion to reinstate Mr. Willingham. He procedurally barred the commissioners from reviewing his actions. Thus, even if some commissioners believed that they had the power to review the Mayor, they were unable to execute the review.

Finally, the Mayor's actions alone did not deprive Mr. Willingham of the opportunity for meaningful review. The Charter's review process contains internal deficiencies that also contributed to Mr. Willingham's plight. The Mayor serves as chairman of the Commission. He directs the Commission's actions by controlling its procedures. The Charter uniquely positions him to preclude review. Thus, the codified review mechanism falters when applied to decisions by the Mayor.

This Court holds that Mr. Willingham lacked the opportunity for meaningful review of his termination. Mayor Arnold therefore functioned as the City's final policymaker. Accordingly, the City can be held liable for his decision.

## II

Mr. Willingham addressed the City Commission on October 12, 2009. He alleges that Mayor Arnold fired him for doing so, in violation of his First Amendment right to freedom of speech. The City contends that Mr. Willingham's comments are not constitutionally protected speech. *See* ECF No. 304 at 8. The

question is whether Mr. Willingham expressed constitutionally protected speech at the City Commission meeting.

"[W]hether a public employee's speech is constitutionally protected turns upon whether the speech related to matters of *public concern* or to matters of merely personal interest to the employee." *Ferrara v. Mills*, 781 F.2d 1508, 1512 (11th Cir. 1986) (emphasis added). "A public employee's speech involves a matter of public concern if it can be fairly considered as relating to any matter of political, social, or other concern to the community." *Cook v. Gwinnett Cnty. Sch. Dist.*, 414 F.3d 1313, 1319 (11th Cir. 2005) (quoting *Connick v. Myers*, 461 U.S. 138, 146 (1983)). To make this determination, courts must analyze the "content, form, and context of a given statement, as revealed by the whole record." *Connick*, 461 U.S. at 147-48.

The City claims that Mr. Willingham's comments should be categorized as either concerning City Administrator Scott's citation of Willingham Seafood or related to certain code violations that the City Administrator asked Mr. Willingham to enforce in his capacity as Police Captain. ECF No. 304 at 10. Either category, argues the City, places Mr. Willingham's speech outside the ambit of the First Amendment.

The critical evidence to determining whether Mr. Willingham's comments are constitutionally protected is a DVD containing footage of the October 12,

2000, meeting.  *See* Mr. Willingham's Trial Ex. 46.[12]  The recording reveals that the City's "categories" are a cramped take on Mr. Willingham's speech.

In constructing its first category, the City overemphasizes the role played by the citation against Willingham Seafood.  Mr. Willingham did not focus solely on the citation against his business.  Rather, properly placed in context, Mr. Willingham's speech was an attempt to influence a political decision in part by sharing a personal story.  *See* ECF No. 166 at 3.

The citation against Willingham Seafood served as anecdotal evidence of the City Administrator's aggressive enforcement of City codes.  Such aggressive and pernicious tactics had been the *focus* of the commissioners' debate just minutes before.  Mr. Willingham's private interest in his business may have animated his speech, but that does not mean the comments did not touch on a public concern.  At the very least, the intended effect—convincing the commissioners to vote down the Mayor's proposal—was certainly thought to be representative of the interests of the greater business community.

The City's second reason for why Mr. Willingham's speech is not protected is that it relates to a "conversation [Mr. Willingham had] with Carl Scott and Chief Hart several days earlier in which they purportedly agreed to 'table' Carl Scott's code enforcement efforts and to seek guidance from the City Commission."  ECF

---

[12] This is the same evidence the Court relied on at summary judgment when it held that Mr. Willingham's comments touched on a matter of public concern.  *See* ECF No. 166.

No. 304 at 9.  According to the City, Mr. Willingham's purpose for addressing the City Commission was to seek guidance on a matter related to his duties as a law enforcement officer.  This personal employment grievance, the City contends, is not a matter of public concern.

This second category is misleading.  First, Mr. Willingham repeatedly emphasized his qualms as a private business owner, not a law enforcement officer. His private interest in his business has nothing to do with the conditions of his employment.  Second, the City overlooks a key intervening event between the October 4th gathering involving Messrs. Willingham, Scott and Hart and the October 12th City Commission meeting—the citation issued against Willingham Seafood.  Even if the original stated reason for attending the meeting was work related, Mr. Willingham's motives surely changed after receiving his citation on October 5th.

The desire to inquire about the tabled issue is at most one of various motives potentially held by Mr. Willingham.  As this Court previously explained, subdividing Mr. Willingham's speech is improper if the overarching message touched on a matter of public concern.  ECF No. 166 at 4.  This Court holds that, viewing the record as a whole, the "content, form and context" of Mr. Willingham's statements can be fairly considered as relating to a public concern. The comments are therefore afforded the protections of the First Amendment.

## III

At issue is whether Mr. Willingham presented sufficient evidence from which a reasonable juror could conclude that Mayor Arnold terminated Mr. Willingham because of his statements to the City Commission on October 12, 2009.

This Court instructed the jury that Mr. Willingham had to prove the following facts by a preponderance of the evidence:

First: Mayor Arnold's actions were "under color" of state law;[13]

Second: [Mr. Willingham] engaged in constitutionally-protected speech when he, as a private citizen, made certain comments at the October 12, 2009 City Commission meeting alleging sudden and arbitrary code enforcement;

Third: Mayor Arnold discharged [Mr. Willingham] from employment;

Fourth: [Mr. Willingham's] comments at the October 12, 2009 City Commission meeting alleging sudden and arbitrary code enforcement was a motivating factor in Mayor Arnold's decision to discharge [Mr. Willingham]; and

Fifth: [Mr. Willingham] suffered damages because of [Mayor Arnold's] actions.

ECF No. 288 at 165-66.[14]

---

[13] The parties stipulated to this element.

[14] The Eleventh Circuit's pattern jury instructions served as the template. *See* Pattern Jury Instructions, Civil Cases, Eleventh Circuit § 4.1 (2013 revision).

Mr. Willingham unquestionably proved the second, third and fifth elements. He presented footage of his speech at the October 12, 2009, City Commission meeting and produced documents evincing his termination.  The evidence also demonstrated that Mr. Willingham suffered damages, including lost wages, due to his allegedly unlawful termination.

The dispute principally concerns whether Mr. Willingham presented sufficient evidence of causation.  This Court finds that he did.  For example, Mayor Arnold terminated Mr. Willingham roughly two weeks after he spoke at the City Commission meeting.  It is well-established that such close temporal proximity between the protected speech and adverse employment action constitutes circumstantial evidence of causation.  *Cf. Constable v. Agilysis, Inc.*, No. 8:10-CV-01778-EAK, 2011 WL 2446605, at *6 (M.D. Fla. June 15, 2011) (holding, in a discrimination case, that a "close temporal proximity sufficient to survive summary judgment" existed where the challenged employment action occurred one month after the protected activity).

Other evidence suggested that Mayor Arnold, whom some witnesses suggested was somewhat difficult, had developed a sense of authoritative entitlement after holding office for nearly half a century.  *See* ECF No. 289 at 151; *see also* ECF No. 77 at 8.  Designating City Administrator Scott as "code enforcement officer" was partially Mayor Arnold's idea.  *See* Mr. Willingham's

Trial Ex. 46 (showing the Mayor introducing, explaining and defending the proposal).  Mr. Willingham clearly opposed the Mayor's proposal.  It is therefore not unreasonable to find that Mayor Arnold could have retaliated against anyone who dared oppose his proposal.

Accordingly, this Court finds that Mr. Willingham furnished a legally sufficient evidentiary basis by which a reasonable juror could find in his favor.

## IV

This Court must decide whether Mr. Willingham produced sufficient evidence from which a reasonable juror could find that Mayor Arnold terminated him due to his political association with mayoral contender Brent Smith.  This Court grants judgment as a matter of law on the political association claim for two reasons.  First, this Court concludes that at the time of his termination, Mr. Willingham's relation with Commissioner Smith was not a "political association" within the meaning of the law.  Second, even if it was, Mr. Willingham failed to present sufficient evidence from which a reasonable juror could find that the alleged political association motivated the termination.  Before elaborating on this ruling, however, this Court revisits the issue of whether Mr. Willingham adequately pled a political association claim.

The truth is that Mr. Willingham's political association claim always teetered on the brink of inadequacy.  The first time this Court looked at the

amended complaint, ECF No. 77, it determined that Mr. Willingham had not met the Federal Rules' pleading standards.  ECF No. 149 at 6.  But upon reconsideration, this Court found that Mr. Willingham sufficiently pled that he engaged in "expressive association" with Mayor Arnold's political opponents, which the Mayor knew about and for which the Mayor terminated him.  *See* ECF No. 180 at 3.

That ruling, admittedly, is nearly untenable.  The most glaring deficiency in Mr. Willingham's amended complaint is his failure to plead that his support of Commissioner Smith in the 2010 mayoral race was a "motivating factor" in Mayor Arnold's decision to terminate him.  Indeed, the only way to raise the causation element above the speculative level is to draw multiple inferences from separate general allegations.  *See* ECF No. 77 at 8, 16.  Because multiple, stacked inferences of that sort are unreasonable, this Court holds that Mr. Willingham never sufficiently pled his political association claim.

To be clear, to the extent Mr. Willingham has alleged *any* political association claim, it is that Mayor Arnold terminated him for supporting Commissioner Smith for mayor in the 2010 campaign.[15]  Mr. Willingham never

---

[15] The record contains references to the F-35 fighter jet.  *See, e.g.*, ECF No. 291 at 129.  For a while, the planned introduction of the F-35 at Eglin Air Force Base, located near the City of Valparaiso, divided the community.  There is no evidence to suggest that Mayor Arnold fired Mr. Willingham because they disagreed on the topic.  There likewise is no evidence that Mr. Willingham voiced his support outside the confines of his seafood business.  *See id.* (testifying that Mr. Willingham's involvement with the F-35 issue was limited to "conversation[s] at [his]

alleged that Mayor Arnold discharged him for additional political reasons nor because of other expressive associations.  *See* ECF No. 289 at 145-167 (describing Mr. Willingham's attempt to expand and reinvent his political association claim); *see also* ECF No. 311 at 16-17 (arguing, in opposition to the City's motion for judgment as a matter of law, that the F-35 issue is intertwined with the political association claim).

Assuming Mr. Willingham adequately alleged his political association claim, the City nonetheless is entitled to judgment as a matter of law.  First, at the time of his termination, Mr. Willingham was not politically associated with Commissioner Smith.  Second, even if he was, Mr. Willingham failed to establish that it was a "motivating factor" in Mayor Arnold's decision.[16]

The right of expressive association protects activities concomitant to the substantive rights enshrined in the First Amendment.  It is "the freedom to associate for the purpose of engaging in activities protected by the First

deck").  Thus, in addition to Mr. Willingham failing to allege *any* expressive association claim related to the F-35, this Court holds that Mr. Willingham's support of the F-35, which was limited to private conversations at his business, does not amount to an expressive association.

Even if it does, Mr. Willingham failed to present sufficient evidence from which a reasonable juror could find that Mayor Arnold terminated Mr. Willingham because of his different opinion.  Notably, there is no evidence that Mayor Arnold *knew* of Mr. Willingham's position on the matter.  The record only shows that the Mayor knew of Mr. Willingham's personal friendship with Commissioner Smith, who did hold opposing views.

[16] The elements for the political association cause of action are identical to those of the freedom of speech action, modified to the particulars of each claim.  *See* Pattern Jury Instructions, Civil Cases, Eleventh Circuit § 4.2 (2013 revision).  Mr. Willingham specifically failed to produce sufficient evidence of causation.

Amendment, such as speech, assembly, petition for the redress of grievances, and the exercise of religion." *McCabe v. Sharrett*, 12 F.3d 1558, 1563 (11th Cir. 1994).

There is absolutely no evidence that, *prior to his termination*, Mr. Willingham associated with Commissioner Smith "*for the purpose*" of supporting him in the March 2010 mayoral election. *McCabe*, 12 F.3d at 1563 (emphasis added). Everyone testified that the two hung out, talked politics in the privacy of Mr. Willingham's business, and went out to lunch together. While they were clearly were friends, the evidence depicts a personal "association" unrelated to Commissioner Smith's bid for mayor. It does not, in other words, establish a political association.

Mr. Willingham at most demonstrated that he *had previously* associated with Commissioner Smith to support his candidacy for office. Mr. Willingham cites, for example, a political rally held at Willingham Seafood in March 2008 as evidence of his political support. *See* ECF No. 311 at 21. Even if this rally constitutes political association, the rally occurred a year and a half before the Mayor terminated Mr. Willingham. Moreover, there is no evidence that in providing these services Willingham Seafood intended it as anything other than a business transaction. Given the enormous temporal gap, it would be unreasonable

to find that such association motivated the Mayor's action, especially when the rally in question had nothing to do with the 2010 mayoral race.

Even if Mr. Willingham's association with Commissioner Smith is protected, Mr. Willingham also failed to demonstrate a causal connection between the alleged political association and the termination.  The primary deficiency is a lack of evidence that Mayor Arnold knew that Commissioner Smith was running for mayor in March 2010 and that he and Mr. Willingham were actively campaigning *before* October 28, 2009, when the Mayor terminated Mr. Willingham.

Mr. Willingham elicited testimony from Mayor Arnold that he had assumed that Commissioner Smith, "in all probability, intended to run" for mayor in March 2010.  ECF No. 289 at 227.  The Mayor also admitted that he assumed Mr. Willingham was in Commissioner Smith's "camp."  *Id.* at 128-131.  Other than that, the only other evidence is that Mayor Arnold knew that Mr. Willingham and Commissioner Smith were friends.  Because it is inconceivable that knowing the identity of a political opponent and her supporters is enough to establish a causal connection, this Court finds that a reasonable juror could not draw the highly attenuated inference that Mayor Arnold discharged Mr. Willingham on the basis of the alleged political association.  Accordingly, the City is entitled to judgment as a matter of law on Mr. Willingham's political association claim.

## CONCLUSION

The jury in this case found that Mayor Arnold of the City of Valparaiso fired Mr. Willingham because of certain comments he made at a City Commission meeting and because of his political association with the Mayor's political opponent.  The City moved for judgment as a matter of law on several grounds. The City contends that it cannot be held liable for the actions of Mayor Arnold because he, unlike the City Commission, is not the City's final policymaker.  The City also claims that Mr. Willingham did not express constitutionally protected speech and that, as a result, his free speech action fails.  Finally, the City maintains that Mr. Willingham did not produce sufficient evidence from which a reasonable juror could find either count in his favor.

This Court holds that Mayor Arnold acted as the final policymaker for the City when he discharged Mr. Willingham.  Critical to this holding, Mr. Willingham did not have the opportunity for meaningful review of his termination by the City Commission.  This Court further concludes that Mr. Willingham made constitutionally protected statements at the City Commission meeting held on October 12, 2009, because the comments related to a matter of public concern. Lastly, this Court determines that although there was sufficient evidence from which a reasonable juror could find in Mr. Willingham's favor on the free speech

claim, the same cannot be said for the evidence supporting the political association claim.  As to that claim, the City is entitled to judgment as a matter of law.

For these reasons,

**IT IS ORDERED:**

1.     The City's motion for judgment as a matter of law, ECF Nos. 303-305, is **GRANTED in part and DENIED in part**.

2.     The City is entitled to judgment as a matter of law on Mr. Willingham's political association claim.  The verdict in favor of Mr. Willingham's frees speech claim stands.

**SO ORDERED on March 19, 2015.**


                                        **s/Mark E. Walker**
                                        **United States District Judge**